THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| Allison Torres-Dillon, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civ. No. 20-01205 (MAJ) |
| Elidaniel Maldonado, | |
| *Defendant*. | |

OPINION AND ORDER

## I. Introduction

On April 30, 2020, Plaintiffs Allison Torres Dillon ("Dillon") and Sharron D. Meijer ("Meijer") filed an action under Article 1802 of the P.R. Civil Code, P.R. Laws Ann. tit. 31 § 5141 against Defendant Elidaniel Maldonado, alleging damages from an automobile accident. (**ECF No. 1**). Plaintiffs seek compensatory damages, punitive damages, attorney fees, and any other relief deemed just and proper by the Court for the injuries resulting from Defendant's negligent driving. (**ECF No. 1 at 6**).

## II. Factual and Procedural Background

### A. The Accident

Per the well-pled facts in the Complaint, on April 29, 2019, Plaintiffs, then New York residents, were vacationing in Puerto Rico. *Id.* at 1-2. They contracted Defendant, an Uber driver, for private transport and guidance. *Id.* at 2-3. On April 30, 2019, Defendant drove Plaintiffs to San Sebastián, frequently using his cell phone while operating the vehicle. *Id.* at 3. Defendant's inattention led him to suddenly brake to avoid a rear-end collision with the vehicle directly ahead. *Id.* at 3-4. The abrupt stop jolted

Plaintiffs forward. *Id.* Dillon struck the dashboard and right door, while Meijer, who was riding in the back seat, struck Dillon's headrest. *Id.* at 4. As a result, Plaintiffs sustained injuries.[1]

      *B.    Procedural Background*

Defendant has failed to plead or otherwise defend this action. On February 24, 2023, Plaintiffs moved for Default Entry against Defendant. (**ECF No. 16**). The Court granted Plaintiffs' Motion for Entry of Default (**ECF No. 18**), which was entered by the Clerk of Court that same day (**ECF No. 19**). On April 13, 2023, a status conference was held with Plaintiffs' Counsel. The case status and matters regarding default were discussed. (**ECF No. 24**). The Court instructed Plaintiffs to "specify in detail the amount of damages requested." (**ECF No. 24**). Plaintiffs failed to comply with this Order.

On June 28, 2023, the Court held a jury-less default hearing on damages. (**ECF No. 28**). *See Graham v. Malone Freight Lines, Inc.*, 314 F.3d 7, 16 (1st Cir. 1999) ("Neither the Seventh Amendment nor the Federal Rules . . . require a jury trial to assess damages after entry of default."). Plaintiffs were represented by counsel, but no counsel appeared for Defendant. *Id.* Plaintiffs gave sworn testimony during direct examination. *Id.* The Court admitted two exhibits into evidence, pending certified copies which were later filed on June 30, 2023. (**ECF No. 30**). Dillon's medical record was admitted as Exhibit 1 and Meijer's as Exhibit 2. (**ECF Nos. 29-1; 29-2**).

## III.  Legal Standard

The Federal Rules of Civil Procedure, Rule 55 requires a two-step process for a default judgment. *Priestley v. Headminder, Inc.*, 647 F.3d 497, 504 (2d Cir. 2011). A

---

[1] The extent of Plaintiffs' injuries and corresponding damages will be discussed below.

plaintiff must first obtain an entry of default when a defendant has failed to defend (Fed. R. Civ. P. 55(a)), and then apply to the court for a default judgment (Fed. R. Civ. P. 55(b)). A judgment by default is appropriate in this case as Defendant has failed to defend or otherwise participate in this action. *See Hawke Cap. Partners, L.P. v. Aeromed Servs. Corp.*, 300 F.R.D. 52, 56 (D.P.R. 2014) (unexcused failure to respond to a motion for default judgment "authorizes the presiding district judge to summarily grant the unopposed motion, at least when the result does not clearly offend equity.") (internal citation and quotations omitted).

For a default motion, factual allegations in the complaint are accepted as true. *See Hooper-Haas v. Ziegler Holdings, LLC*, 690 F.3d 34, 41 (1st Cir. 2012) ("Where the complaint contains facts sufficient to state a claim upon which relief can be granted, the defendant's liability is established at the time of default."); *Ramos-Falcon v. Autoridad de Energia Electrica*, 301 F.3d 1, 2 (1st Cir. 2002) (the court considers "all well-pleaded factual allegations as true, to determine whether it alleges a cause of action."); *Franco v. Selective Ins.*, 184 F.3d 4, 9 n.3 (1st Cir. 1999) ("A party who defaults is taken to have conceded the truth of the factual allegations in the complaint as establishing the grounds for liability as to which damages will be calculated.").

## IV.    Applicable Law

Article 1802 of the Civil Code provides, in pertinent part, that "[a] person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done." P.R. Laws Ann. tit. 31, § 5141. Under Puerto Rico law, a plaintiff bringing a tort claim under Article 1802 must show "(1) an act or omission resulting from fault or negligence; (2) damages; and (3) a causal connection between the act or omission and the injuries." *Bauza v. Universal Ins. Co.*, 18-cv-1705, 2020 WL

13158669, at *5 (D.P.R. Aug. 4, 2020) (citing *Colon v. Blades*, 717 F. Supp. 2d 175, 185-86 (D.P.R. 2010)). These elements must be demonstrated beyond the preponderance of the evidence, which means proving that the defendant's negligent conduct or omission was the factor that most probably caused the plaintiff's damages. *Marcano Rivera v. Turabo Med. Ctr. P'ship*, 415 F.3d 162, 168 (1st Cir. 2005).

Damages in Puerto Rico are compensatory. *In re Caribbean Petroleum, LP*, 561 F. Supp. 2d 194, 199 (D.P.R. 2008). In determining the recoverable damages for a party, courts must interpret Article 1802 liberally, given its purpose is remedial in nature. *Colon v. Blades*, 717 F. Supp. 2d 175, 186 (D.P.R. 2010). Therefore, the purpose of adjudication of damages pursuant to Article 1802 is to put the injured party, as nearly as possible, where she would have been had the breach not occurred. *In re Caribbean Petroleum,* at 199-200.

Courts in this Circuit have acknowledged assessing and valuing damages is a "delicate challenge." *Id.* at 200; *see also Petro v. Town of W. Warwick ex rel. Moore*, 889 F. Supp. 2d 292, 345 (D.R.I. 2012) ("Assigning such pain and suffering a monetary value is no easy task, and it goes without saying that 'converting feelings such as pain, suffering, and mental anguish into dollars is not an exact science.'" (quoting *Correa v. Hosp. San Francisco,* 69 F.3d 1184, 1198 (1st Cir. 1995))). "There is no mechanical system applicable by courts to arrive at an exact evaluation of damages." *Torres v. Zarchi*, 19-cv-1386, 2022 WL 16549063, at *3 (D.P.R. Oct. 31, 2022) (citing *Rodriguez Cancel v. A.E.E.*, 16 P.R. Offic. Trans. 542, 551 (1985)). "Indeed, 'the human assessment of intangible elements such as pain . . . or frustration,' 'is not devoid of a certain degree of speculation.'" *Torres*, 2022 WL 16549063 at *3 (quoting *Laclaustra Sánchez v. Prime Outlets Puerto Rico,* 08-cv-1757, 2009 WL 10717485, at *4 (D.P.R. July 23, 2009), *report and recommendation*

*adopted*, 2009 WL 10717443, at *1 (D.P.R. July 27, 2009)).

"Awarding an insufficient sum in damages has the effect of diminishing the civil liability to which the tortfeasor must be subject; on the other hand, awarding an exaggerated sum entails a punitive element not recognized in [Puerto Rico's] legal system." *In re Caribbean Petroleum,* at 200. Thus, when awarding damages, courts must reasonably balance the damages caused and the compensation awarded. *Id.*

To determine the reasonable value of mental and emotional damages specifically, a plaintiff must offer evidence showing "some appreciable measure" that their well-being, health, and happiness have suffered. *Ruiz-Rodríguez v. Colberg-Comas*, 882 F.2d 15, 17 (1st Cir. 1989) (emphasis removed) (quoting *Moa v. Commonwealth*, 100 P.R.R. 572, 585-86 (1972)). "In awarding damages for pain and suffering, the factfinder 'is free . . . to harmonize the verdict at the highest or lowest points for which there is a sound evidentiary predicate,' so long as the result does not 'strike such a dissonant chord that justice would be denied were the judgment permitted to stand.'" *Petro*, 889 F. Supp. 2d at 345 (quoting *Litif v. United States,* 682 F.Supp.2d 60, 85 (D. Mass. 2010), *aff'd* 670 F.3d 39 (1st Cir. 2012)).

Finally, after a plaintiff has established the elements of negligence, a court will determine the amount of damages a plaintiff is entitled to recover. *Santiago v. Hosp. Cayetano Coll y Toste*, 260 F. Supp. 2d 373, 378 (D.P.R. 2003) ("Defendant did not appear for trial" thus "the extent of damages is not questioned. Therefore, the damages are left to the Court's" weighing of the "evidence."). *See Id.; see also In re Caribbean Petroleum,* from 199–200.

## V.    Analysis

In the instant case, the Clerk of Court has entered default against Defendant. (**ECF**

No. 19). Because Defendant is in default, this "constitutes an admission of all facts well-pleaded in the complaint." *Metropolitan Life Ins. Co. v. Colón Rivera*, 204 F. Supp. 2d 273, 274-275 (D.P.R. 2002); *see also In re The Home Restaurants, Inc.,* 285 F.3d 111, 114 (1st Cir. 2002).

Accordingly, the Court finds Defendant liable under 31 L.P.R.A. § 5141, which "imposes liability on any person or entity who by an act or omission causes damage to another through fault or negligence." *Franco v. Selective Ins. Co.*, 184 F.3d 4, 9 n. 3 (1st Cir. 1999). Consequently, the Court **ADJUDGES and DECREES** that Defendant acted negligently, and such negligent actions were the cause of Plaintiffs' damages.

As a result, the only issue remaining for consideration is the amount of damages owed to Plaintiffs that are causally connected to Defendant's negligence. *See Carrozza v. CVS Pharmacy, Inc.*, 992 F.3d 44, 57 (1st Cir. 2021) ("burden is on the plaintiff to establish a causal connection between the alleged negligence of a defendant and any damages."). Importantly, "once the entry of a default establishes the fact of damage, the trial judge . . . has considerable latitude in determining the amount of damages." *See Jones v. Winnepesaukee Realty*, 990 F.2d 1, 4 (1st Cir. 1993).

### 1.      Plaintiff Meijer

#### i.   Meijer's Testimony[2]

Meijer testified she is a native of New York, presently running a house and

---

[2]      The Court has already concluded that Defendant acted negligently based on the well-pled facts of the Complaint that are taken as true. Thus, the Court will omit testimony offered by Meijer in relation to Defendants' negligent conduct in this Opinion and Order and instead focus on testimony relevant to assessing Plaintiffs' damages. *See, e.g., Santiago, 260 F. Supp. 2d at 378; Metropolitan Life Ins. Co.*, 204 F. Supp. 2d at 274-275 ("The default of a defendant constitutes an admission of all facts well-pleaded in the complaint."); *see also In re The Home Restaurants, Inc.*, 285 F.3d at 114 ("[A] party gives up right to contest liability 'when it declines to participate in the judicial process.'"); *Goldman, Antonetti, Ferraiuoli, Axtmayer & Hertell v. Medfit Int'l., Inc.*, 982 F.2d 686, 693 (1st Cir. 1993) ("[A]n entry of a default against a defendant establishes the defendant's liability."); *Brockton Savings Bank v. Peat, Marwick, Mitchell &*

appliance repair business alongside a partner. (**Hrg. Tr. at 4**). The venture, established in 2020, functions under the names A Good Appliance Guy, USA, LLC, and Adir Appliance, LLC. *Id*.

On April 30th, 2019, Defendant arrived at Plaintiffs' hotel to conduct a tour around the island. (**Hrg. Tr. at 4**). However, Plaintiffs were primarily interested in visiting a waterfall located in San Sebastián, which was a substantial distance from their hotel. *Id*. As Meijer and Dillon traveled in Defendant's automobile—Meijer in the back seat, Dillon up front—Defendant exited the highway, and while not cognizant of the vehicle immediately ahead of him abruptly applied the brakes resulting in an accident. *Id*. at 4-7. Meijer asserts that the impromptu stop and ensuing contact with the vehicle ahead led to her head knocking against the headrest of the front seat and a plastic phone charger attached to the seat.

Police were already at the accident site for an unrelated matter, and likely witnessed the incident, Meijer said. *Id*. at 7. However, after speaking with police, Plaintiffs and Defendant were informed that they would have to go to the "precinct" to follow up on reporting the accident to authorities. *Id*. According to Meijer, Defendant "convinced" Plaintiffs that it was not worth their time to travel to the precinct given it would "waste" their last remaining day in Puerto Rico. *Id*. As a result, Plaintiffs continued onward to the waterfalls with Defendant driving. *Id*.

---

*Co*., 771 F.2d 5 (1st Cir. 1985) ("[T]here is no question that, default having been entered, each of [plaintiff's] allegations of fact must be taken as true and each of its [ ] claims must be considered established as a matter of law."); *Caribbean Produce Exchange v. Caribe Hydro–Trailer, Inc*., 65 F.R.D. 46 (D.P.R. 1974) ("[I]t is the law that once a default is entered, a defendant on default has no further standing to contest the factual allegations of plaintiff's claim for relief . . . Defendant is deemed to have admitted all well pleaded allegations in the complaint. At the most, all that defendant can do is question the extent of the damages suffered by the plaintiff.").

Upon reaching the waterfalls, Meijer reported experiencing considerable discomfort, suffering from both back pain and headaches. *Id.* at 8. In response to questions about her injuries, Meijer stated that along with back pain, she was experiencing facial and neck pain. *Id.*

Meijer testified she did not seek any medical help while still in Puerto Rico. *Id.* at 8. Instead, Meijer received medical attention at some point upon returning to New York, specifically at "14th Street Medical". *Id.* In response to whether 14th Street Medical was her primary care facility, Meijer responded, "I usually don't go to the doctor a lot . . . but yes, at the time, I went to that doctor for everything." *Id.*

Under the care of 14th Street Medical, Meijer underwent several check-ups, received pain medication, and had two different scans, including an MRI. According to Meijer, she was diagnosed with post concussive syndrome. *Id.* at 10. Meijer also testified that she experienced a heightened sensitivity to light, persistent headaches, lower back pain, and intermittent tingling in her legs and feet. *Id.* at 10-11. Meijer testified she experienced severe headaches intermittently for six months following the accident. *Id.* at 11. She rated the intensity of these headaches between "seven to eight" on a scale of one to ten. *Id.* Meijer stated she decided not to seek additional treatment after this period because of concerns over potential medical costs. *Id.* at 12.

As for any current symptoms, when asked, "Do you have any symptoms today, [Meijer], that you believe is related to the accident that you had in Puerto Rico during your vacation on April 30th of 2019?" Meijer responded: "To be honest with you, I do get migraines sometimes, but I don't know if that's directly related." *Id.* at 13.

The Court made several inquiries with Meijer after direct examination. *Id.* at 17-22. During this exchange, Meijer stated she struck her head against the headrest in front

of her as a result of the collision. *Id.* at 18. The Court then had the following exchange with Meijer regarding her use of a seat belt and continuing to ride in Defendant's vehicle following the crash:

> THE COURT: Were you wearing a seatbelt?
> THE WITNESS: Yes, I was wearing a seatbelt.
> THE COURT: And even with the seatbelt, you hit your head?
> THE WITNESS: Yes, I hit my head really bad.
> THE COURT: Okay. You said you continued to the waterfalls.
> THE WITNESS: Yes.
> THE COURT: With the same driver?
> THE WITNESS: Yes.

*Id.*

Meijer stated that Defendant minimized the accident's severity, leading the Plaintiffs to continue their journey to the waterfalls with him still driving. *Id.* at 18-19. Despite experiencing headaches during their half-hour stay at the waterfalls, Meijer tried to enjoy the day. *Id.* at 20. When asked if they had requested the driver take them to the hospital, Meijer was unsure. *Id.* at 21.

### ii. Examination of Meijer's Medical Records

The Court has conducted a meticulous review of the certified medical records from 14th Street Medical in New York, introduced at the damages hearing as Exhibit 2. According to the records, Meijer first sought medical attention three weeks after the accident and made five (5) visits to the medical center occurring on May 20, 2019; May 24; June 6; June 12; and June 17, respectively. (**ECF No. 29-2 at 1-19**). After scrutiny of the medical records, the Court finds that it contradicts many of Plaintiff's claims, particularly regarding the onset of certain symptoms such as her alleged neck and back pain.

a. Headaches

During her first visit, on May 20, 2019, the medical notes state Meijer was there for an "annual preventive exam." *Id.* at 17, and not because of trauma due to the accident. *Id.* at 9. During this "annual preventive exam," the clinician's notes indicate Meijer was "worried" following a motor vehicle accident she had been involved in while in Puerto Rico three weeks prior, where she "struck her head." *Id.* She reported having headaches and described the pain level as 4 out of 10. *Id.* at 17, not 7 to 8 as she testified. There is no indication on the record as to the frequency of the headaches.

During Meijer's second and third medical appointments on May 24 and June 6, respectively, she reported still having headaches, yet she reported "no loss of consciousness, no seizures, dizziness, tremors, confusion, memory loss, blackouts, double vision, vertigo or blurred vision." *Id.* at 9, 15.

During the June 6 visit, the medical notes reported Meijer's headache as "not related to trauma; triggered by life events; stress at work." *Id.* at 9. That said, the same notes also describe Meijer's headaches as having "started with [the motor vehicle accident]," that the headaches were "getting better," that Meijer was only experiencing headaches once a week, and that the severity is "mild to moderate." *Id.* at 12.

Notably, in the medical records from Meijer's last two visits to 14th Street Medical, headaches are not listed under Meijer's History of Present Illnesses ("HPI"). *Id.* at 4, 7. Instead on June 12, her "chief complaint" was "fatigue," and she was assessed with "subclinical hypothyroidism." *Id.* at 7. Similarly, on June 17, her "chief complaint" was "low back pain," and she was assessed with "Lumbosacral radiculitis" and "neck pain." *Id.* at 3, 5. Accordingly, there is nothing in the record to suggest Meijer was still suffering from headaches after they were last documented on June 6. *Id.* at 9.

b. Neck and Lower Back Pain

Upon review of Meijer's medical record, the Court finds that her back and neck problems were not caused by the accident. Instead per the medical records, and as discussed below, the likely cause was from two separate incidents: a pre-existing condition and "an argument with her ex-boyfriend, who shoved her" causing "her head and lower back [to] hurt." (**ECF No. 29-2 at 17**). Meijer reported the latter occurred on the morning of May 20, hours before her visit to the medical center for an "annual preventive exam." *Id.* Indeed, not until Meijer's **third** visit on June 6, does back pain appear as Meijer's current health complaint (HPI). *Id.* at 9. Said differently, not until June 6 does Meijer seek treatment for back pain, which is two weeks after the physical domestic altercation and more than six weeks after the car accident. It is not until this date, that Meijer alleged that the back pain was caused by the accident. The notes on that day state: "hit head; had headache; then developed low-back pain; had neck pain the day of the MVA [motor vehicle accident] and the next day; Feet feel numb intermittently." *Id.* at 12. In addition, her neck pain is described as having persisted "for several days" before being alleviated by a massage. *Id.* Thereafter, and most notably, Meijer was assessed with "low back pain" post "a motor vehicle accident" occurring on "4/30/19" wherein Meijer was an "**unbelted** passenger." *Id.* at 11 (emphasis added).

At Meijer's fifth and final medical appointment on June 17, 2019, Dr. Najafi examined Meijer and reported she was complaining of "neck; lower back; pain radiating to the leg(s)." *Id.* at 4. The pain level was rated as "improving; pain level 6/10." *Id.*

It is noteworthy that at Meijer's June 17 doctor's visit, Meijer's complaint of neck, lower back, and calf pain is documented as having begun "3 months ago." *Id.* The doctor's notes stated that the pain has been "chronic (more than 3 months)." *Id.* Tracing back three

months from her June 17 visit, the onset of these symptoms falls around March 17, 2019. This date was approximately six weeks before the accident. This suggests that the pain in Meijer's neck, lower back, and legs is the result of a pre-existing condition, that was exacerbated by the domestic violence incident and not attributable to the Defendant's conduct.

### iii. Meijer's Credibility and Causal Connection

While Defendant is liable for negligence as the result of his default, Plaintiffs must still show beyond the preponderance of the evidence that his negligent conduct most probably caused their harm. *See Baum-Holland v. Hilton El Con Mgmt.*, LLC, 964 F.3d 77, 93 (1st Cir. 2020) (cleaned up). A "mere possibility of such causation is not enough; and when the matter remains one of pure speculation and conjecture, or the probabilities are at best evenly balanced" plaintiff will not have carried their burden. *Id.*

While generally, a factfinder may not reject uncontradicted or uncontested testimony unless credibility is at issue, a factfinder may reject such testimony when it is improbable or contradictory. *Quintana-Ruiz v. Hyundai Motor Corp.*, 303 F.3d 62, 75-76 (1st Cir. 2002). There must however be affirmative evidence to put the witness's credibility in doubt. *Id.* When the issue of damages is based "entirely on the credibility of the parties' testimony" a factfinder can choose to either credit or discredit the testimony. *See Diaz Rivera v. Rivera Rodríguez*, 247 F. Supp. 2d 106, 107 (D.P.R. 2003).

Upon review of the record, the Court does not find Meijer's testimony credible. In effect, Meijer claims what was a minor accident led to major problems including severe neck, back, and limb pain and persistent headaches and migraines. Meijer has not shown beyond the preponderance of the evidence that the accident caused her neck, back, and

limb injuries. The Court only accepts that Meijer's headaches, that lasted for a few weeks, were caused by Defendant's negligence, but no more.

The credibility of Meijer's account is in question because of inconsistencies between her testimony and the medical records. It is further doubtful that her testimony is credible given that her medical records state she had "chronic" "neck" and "lower back" pain that began "months" before the accident. (**ECF No. 29-2 at 4**). These pre-existing conditions weaken the causal link attributable to Defendant's conduct. Importantly, it is still Plaintiff's burden to establish a causal relationship between the injury and the alleged consequences when a tortfeasor aggravates a pre-existing condition. *Bouchard v. United States*, 501 F. Supp. 2d 200, 203 (D. Me. 2007).

Several weeks after the accident on May 20, Meijer reported to her clinician that she had been in an argument with her ex-boyfriend that morning. According to Meijer, he "shoved her" and as a result, "now her head and lower back hurt." (**ECF No. 29-2 at 17**). This medical disclosure is at odds with Meijer's testimony and is evidence that an intervening cause, a physical altercation with an ex-boyfriend, exacerbated her back conditions and is the source of her head and back injuries. *See Tyler v. P.R. Convention Ctr. Dist. Auth.*, 19-cv-1385 (JAG), 2022 U.S. Dist. LEXIS 201655, at *4 (D.P.R. Oct. 11, 2022) (finding plaintiffs had failed to address why an assault should not be deemed an intervening cause that broke the chain of causality).

Additional inconsistencies further diminish Meijer's credibility. Take Meijer's testimony that she was wearing a seat belt at the time of the accident. (**Hrg. Tr. at 18**). Despite this assertion, the medical records document her as an "unbelted passenger" during the April 30 incident. (**ECF No. 29-2 at 11**). Moreover, Meijer's claim that she

was wearing a seat belt in the backseat, is at odds with her account of having hit her head against the headrest and a phone charger, an unlikely occurrence for a belted passenger.

The discrepancies in Meijer's seatbelt usage not only diminish her credibility, but also break the causal link between the Defendant's negligence and most of her injuries. It also suggests comparative negligence. *See Quinones-Pacheco v. Am. Airlines, Inc.*, 979 F.2d 1, 3 (1st Cir. 1992) (denying damages since plaintiffs' injuries, were uncorroborated and likely fabricated and thus could not be linked to defendant's actions. Additionally, neither plaintiff wore seat belts, attributing 40% negligence to each); *Smith v. Williams Hosp. Mgmt. Corp.*, 950 F. Supp. 440, 448 (D.P.R. 1997) (concluding that plaintiffs failed to establish a causal link between a hand injury and defendant's alleged negligence, where plaintiff's failure to wear a seat belt was found to be one of several intervening causes).

Finally, per her testimony, the fact that Plaintiffs continued with their tour, despite the alleged distress, hints at a perhaps less severe situation than Meijer's testimony would have us believe. *Id.* at 18-19.

Viewed as a whole, the Court rejects Meijer's testimony as it relates to her neck and back injuries. The affirmative medical evidence puts her credibility in grave doubt as to the source of those injuries. *See Quintana-Ruiz*, at 75-76. In turn, this diminishes the likelihood that Defendant's conduct is the source of her neck and back injuries. *See Irwin v. Eclectic Dining, Inc.*, 155 F. Supp. 3d 126, 129 (D. Mass. 2016) (despite claims of ongoing fatigue, dizziness, and anxiety from a mild traumatic brain injury after a customer was injured at a restaurant by a wind-blown umbrella, other evidence about the customer's daily activities and vacations after the incident challenged the veracity of customer's complaints of ongoing debilitating post-concussion symptoms). Thus, the

Court will discredit her testimony accordingly in resolving the issue of damages. *See Quintana-Ruiz,* 303 F.3d 62 at 75-76; *Diaz Rivera,* 247 F. Supp. 2d 106 at 107.

> iv.  Apportionment of Responsibility and Award of Damages[3]

Meijer has not put forward any documentation regarding economic damages. Nor did she offer any testimony at the damages hearing that allows for a calculation of lost wages, if any. "Unlike general damages for pain and suffering, which are not susceptible to proof by a dollar amount, medical expenses and loss of earnings must be proved by evidence demonstrating the reasonable value of those losses." *Mejias-Quiros v. Maxxam Prop. Corp.,* 108 F.3d 425, 428 (1st Cir. 1997).

Accordingly, the Court will not award damages for loss of earnings given Meijer has not produced any evidence to support such an award. *See Lopez-Marti v. GEICO Ins. Co.,* 20-cv-1433 (ADC), 2023 U.S. Dist. LEXIS 57306, at *8 (D.P.R. Mar. 31, 2023) (following a minor car accident, court refused to award damages for lost wages to plaintiff who only provided scant documentation regarding economic loss and failed to adhere to court's order to provide evidence substantiating her alleged economic harm).

Nonetheless, weighing the evidence in the record, including Meijer's medical documentation and testimony, the Court concludes that there is a "causal connection between" Defendant's negligent conduct and that it "most probably caused" the headaches Meijer complained of during her first, second, and third visits. *See Marcano Rivera,* 415 F.3d at 168. The Court finds that Meijer has proven by a preponderance of

---

[3]     Of note, neither Plaintiff provided a specific request for damages, leaving their desired compensation unclear. Although the Court instructed Plaintiffs to specify damages (**ECF No. 24**), no documentation or verbal clarification was provided during the damages hearing. *See Trinidad v. City of Bos.,* 07-cv-11679 (DPW), 2011 U.S. Dist. LEXIS 26416, at *10 (D. Mass. Mar. 15, 2011) (awarding only nominal damages, due to counsel's repeated failures to file submissions for a default judgment within set deadlines, hindering the court's ability to determine damages).

the evidence that the headaches she suffered were caused by Defendant's negligence.

Having found that Defendant's negligence caused injury to Meijer, the Court must now determine what degree of responsibility each party bears. Puerto Rico is a "comparative-negligence jurisdiction." P.R. Laws Ann. tit. 31, § 5141 (2008); *Rodríguez v. Señor Frog's de la Isla, Inc.*, 642 F.3d 28, 37 (1st Cir. 2011). This means damages are reduced based on the proportion of the claimant's fault in causing those damages. *See Bernardi Ortiz v. Cybex Int'l, Inc.*, 345 F. Supp. 3d 107, 131 (D.P.R. 2018); *see also Ayala Martinez v. Puerto Rico CVS Pharmacy, LLC.*, 19-cv-2098 (MEL), 2022 WL 1289356, at *4 (D.P.R. Apr. 29, 2022) (comparative negligence acts to reduce the relief awarded "proportionate to the degree of plaintiff's negligence.").

The Court determines that Plaintiff is partially responsible for her circumstances given her failure to wear a seat belt which is a violation of Puerto Rico law.[4] *See Quinones-Pacheco*, 979 F.2d 1 at 3; *see also Pasternak v. Achorn*, 680 F. Supp. 447, 449 (D. Me. 1988) (a passenger's failure to wear a seat belt may implicate comparative negligence). More specifically, the Court concludes that Meijer is 25% at fault for her injuries. Accordingly, her damages, originally $4,000, are reduced by 25%, resulting in a final **AWARD** of $3,000.

### 2.   **Plaintiff Dillon**

#### i.   Dillon's Testimony[5]

Dillon testified that she is a resident of Miami, Florida, and currently works as an

---

[4]      "Any person who drives or is a passenger on the public highways in a motor vehicle which must be equipped with safety seat belts according to § 5381 of this title, seat belts that are available and in usable condition, shall be obliged to adjust and properly secure said seat belts while the vehicle is being driven on the public highways." 9 L.P.R.A. § 5382.

[5]      As noted previously, the Court will omit testimony offered by Dillon in relation to Defendants' negligent conduct and instead focus on testimony relevant to assessing Plaintiffs' damages.

event planner at Amor Events, a position she has held since 2020. (**Hrg. Tr. at 17-18**). The incident occurred at 12:38 p.m. in the town of Quebradillas. *Id.* at 20. At the time of the collision, Dillon reported she was seated in the front passenger seat. *Id.* Dillon states she was wearing her seat belt at the time of the collision. *Id.* at 20, 22.

Upon impact, Dillon reported experiencing immediate severe back pain, a sensation of shock, and presumably a momentary blackout. *Id.* at 22. Dillon described it as "really bad, hard pain, like, back pain." *Id.* Dillon specified the presence of pain "all around here" (pointing to her back, neck, and right upper temple), which was the result of her hitting the "front of the car," particularly the dashboard. *Id.* at 23. In the aftermath of the accident, Dillon reported she could not "feel [her] legs until, like, the day after." *Id.*

Despite the accident, Plaintiffs continued to their planned destination. Dillon contends their decision was based on Defendant's reassurances that the incident "wasn't a big deal, that the pain was going to pass away" and that they "were already . . . halfway" to the destination. *Id.* at 20. As a result, they traveled for another hour to the waterfalls in the same vehicle that had been involved in the collision, with Defendant driving.

As for damage to the vehicles involved in the accident, Dillon stated, "it wasn't, like, a lot of damage to the other car, the other car didn't really have that much damage." *Id.* at 21. Thus, it can be inferred that Defendant's vehicle did not sustain much damage either, given it was able to transport them to the waterfalls and then back to San Juan, a journey that took approximately two more hours. *Id.* at 14.

At the waterfall, Dillon experienced discomfort throughout her body, specifying that "my head, it was -- it was really hurting, like, I was having, like, a migraine, and my neck and my whole back, it was really hurting." *Id.* at 25. The pain was so severe that she was unable to participate in activities such as swimming. *Id.* She remembered, "we were

just trying to enjoy the moment and, like, not worry about the pain, but it was getting, like, really bad by the end of the night." *Id.*

Following the accident, Plaintiffs returned home to New York on or around May 2, 2019. *Id.* Dillon sought immediate medical care due to her worsening condition, which left her unable to walk. *Id.* at 26. Her care was administered at Woodhull Hospital in Williamsburg, Brooklyn, where she was given painkillers, among other medications. *Id.* She stated, "I didn't do an MRI because I remember it didn't cover, my insurance, but then I went to a physical therapy in Williamsburg called Brooklyn Body Works, and I did that for, like, a few months. I was doing physical therapy." *Id.*

Dillon described the treatment at Brooklyn Body Works as centered on her lower back pain, which continued to be a prominent issue for her. *Id.* at 27. She affirmed that most of her pain resided in her neck, back, and legs. *Id.* She further testified that her headaches had receded within the first 48 hours following the incident, but her back pain remained, concentrated in the middle and lower regions. *Id.* When asked to quantify the severity of her pain on a scale of one to ten, she ranked it beyond ten, stating: "11, 12. It was really bad pain. Like, I had to be in bed, and then for, like, weeks I couldn't go to work. It affected my income, and that's when I decided to do physical therapy, because it was not getting any better." *Id.* at 28.

Before the accident, Dillon was employed as a bartender at a sports bar called "Redemption" in New York. *Id.* at 29-30, 33. Her job required her to be on her feet for extended periods, often working "an eight-hour shift" and sometimes even "16 hours, 12 hours." *Id.* at 29. She testified that her earnings amounted to around $2,000 per week, culminating in an annual income of between $95,000 to $100,000. *Id.* at 29-30, 33.

Dillon testified that the auto accident had a significant impact on her employment

and earnings. In the immediate aftermath, her physical therapist advised against standing for long periods due to the back pain caused by the accident. *Id*. at 29. Consequently, she had to reduce her working hours drastically, an adjustment that came with a significant drop in her weekly income. Though she continued working part-time to manage her bills, the pain eventually became "unbearable," forcing her to reconsider her career options. *Id*. at 30, 37.

Approximately "one and a half to two months" post-accident, Dillon decided to leave her bartending job and switch careers, a choice that she pointed out "definitely affect[ed] my income." *Id*. at 36. She initially started working for a company called "Blue Ribbon" in New York as an event planner and office manager. *Id*. at 43-44. At Blue Ribbon, Dillon's income dropped to "around $70,000 per year," a notable decrease from her previous bartending earnings of $95,000. *Id*. at 33. Currently, Dillon is employed by a company called Amor Events where she earns about $75,000 annually. *Id*. at 35. Although this is slightly more than her initial post-accident income at Blue Ribbon, it still represents a substantial decrease from her pre-accident earnings of $95,000 as a bartender. Dillon stated, "I decided to switch careers because [I] couldn't do the bartending job anymore"; "I decided to stop doing it because it was really hurting my back. And at that point it was unbearable." *Id*. at 36-37.

Of note, Dillon testified that she did not have medical insurance from her employer while bartending and does not currently hold any private insurance coverage. *Id*. at 35. She had some form of insurance, but she was uncertain of the specifics, mentioning that a friend had helped her obtain it. *Id*. at 34.

Currently, Dillon tries to exercise five times a week, which includes cardio and light weightlifting under the supervision of a personal trainer, who is cognizant of her back

condition. *Id.* at 35. However, for almost two years following the accident, Dillon was unable to exercise due to persistent pain. *Id.* at 36.

      ii.  Dillon's Medical Records

Dillon submitted her medical records from Brooklyn Body Work Physical Therapy, PC ("Brooklyn Therapy") from July 12, 2019, to August 28, 2019. (**ECF No. 29-1 at 1**).[6] During this time, she had eight (8) physical therapy sessions. *Id.* at 5. Initial functional testing scored her back index at 34, indicating a 66% impairment. (**ECF No. 29-1 at 6**). Functional reporting for "Mobility: Walking & Moving Around" scored her to be "At least 60% But Less Than 80% Impaired," with a goal of "At Least 40% But Less Than 60% Impaired." *Id.*

For the 8 sessions she did receive treatment for, the total fees amounted to $3,630.02. *Id.* at 5. Dillon did not disclose whether she completed all the physical therapy sessions that were prescribed or discontinued any remaining treatment for other reasons. Moreover, the record is devoid of any evidence as to the long-term effects and lasting impairment from her injuries, if any.

      iii.   Dillon's Award of Damages

        a.  Economic Damages

Dillon's auto accident led to severe back pain that necessitated a shift in her career and a significant decrease in her income. She had been earning around $95,000 annually as a bartender, working 35 to 40 hours per week. (**Hrg. Tr. at 30**). Post-accident, Dillon had to reduce her working hours and eventually switch careers to accommodate her

---

[6]     Dillon did not submit any documentation relating to her hospital bills following her return to New York post-accident. Thus, the Court will not speculate as to the amount of hospital expenses she incurred because of her hospital visit.

physical limitations. *Id*. This change resulted in an approximate annual income loss of $20,000 per year *Id*. at 32-33. Plaintiff's career change occurred on or around July 2019, thus she will be credited with lost income for four years, resulting in $80,000 in economic damages.

### b.  Medical Expenses

Per Dillon's medical records, in 2019 following the accident, her functional mobility was rated as "At Least 60% But Less Than 80% Impaired." (**ECF No. 29-1 at 6**). However, Dillon did not introduce any medical evidence to corroborate or expound upon her alleged future prognosis, such as that her injury is inoperable. Thus, Dillon has failed to persuade the Court that she is without any long-term remedy and is thus forced to endure a lifetime of physical pain and suffering. *See Whitfield*, 431 F.3d at 17.

That said, the physical therapy Dillon underwent and the $3,630.02 in costs for the treatment are directly attributable to Defendant's conduct. (**ECF No. 29-1 at 2-5**). Accordingly, the Court finds those costs are compensable regardless of whether Dillon's insurance covered the treatment either in whole or in part. *See Villarini-Garcia v. Hosp. del Maestro*, 112 F.3d 5, 7 (1st Cir. 1997) (the "'collateral source' rule allows a plaintiff to receive payments such as charitable donations and payments from his own insurer without losing the ability to recover the full amount of his loss from the wrongdoer or wrongdoers."); *see also Toro v. Sanchez*, 141 F. Supp. 2d 195, 196 (D.P.R. 2001) ("Under the collateral source doctrine a plaintiff need not offset her recovery from the defendant by the amount of any benefits received from sources" such as an "insurance policy.").

### c.  Pain and Suffering

The amount of money appropriated as compensation for pain and suffering cannot be determined by any precise measure or rule. *Serrano v. Nicholson Nursery, Inc*., 844

F. Supp. 73, 76 (D.P.R. 1994); *see also Mejias-Quiros v. Maxxam Prop. Corp.*, 108 F.3d 425, 428 (1st Cir. 1997) (general damages for pain and suffering, are not susceptible to proof by a dollar amount). "Judgment in this field is necessarily subjective and must rest upon an evaluation of: 1) the severity of the pain suffered; 2) its duration; and 3) its mental consequences." *Id.*; *see also Mejias-Quiros*, 108 F.3d at 428 ("On pain and suffering, courts readily tolerate estimates . . . based on a description of the injury.").

In light of the evidence presented, the Court finds that Dillon has suffered significant physical pain and emotional distress as a direct result of Defendant's negligent operation of a vehicle. Accordingly, the Court hereby **AWARDS** Dillon $50,000 in damages to compensate her for pain and suffering. This amount is commensurate with the severity of the pain Dillon endured, its duration, and corresponding mental consequences. *See Serrano*, 844 F. Supp. at 76.

In sum, the Court finds Dillon has shown by a preponderance of the evidence, that she suffered compensable damages in the amount of Dillon $133,630.02 caused by Defendant's negligence. *See Marcano Rivera,* at 168.

## VI.   Conclusion

The Court enters Judgment in favor of Plaintiffs and **AWARDS** Plaintiffs damages payable by Defendant jointly and severally as follows:

(a)   $3,000 reflecting pain and suffering for Plaintiff Meijer; and
(b)   $133,630.02 reflecting Plaintiff Dillon's loss of income, medical expenses, and pain and suffering.

For a total of **$136,630.02**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 28th day of July 2023.

$$\text{S/ MARÍA ANTONGIORGI-JORDÁN}$$
**United States District Judge**